1  MICHAEL A. MAZZOCONE (STATE BAR NO. 183209)
EMAIL: MICHAEL@MAZZLAW.COM
2  MICHAEL A. MAZZOCONE, ATTORNEY AT LAW
601 MONTGOMERY STREET, SUITE 850
3  SAN FRANCISCO, CA 94111
PHONE: (415) 399-0800
4  FAX: (415) 399-0900

5
ROB HENNIG (STATE BAR NO. 174646)
6  EMAIL: ROB@EMPLOYMENTATTORNEYLA.COM
SAM BROWN (STATE BAR NO. 308558)
7  EMAIL: SAM@EMPLOYMENTATTORNEYLA.COM
HENNIG KRAMER LLP
8  3600 WILSHIRE BLVD., SUITE 1908
LOS ANGELES, CA  90010
9  PHONE: (213) 310-8301
FAX: (213) 310-8302
10

11  Attorneys for Plaintiffs and the Putative Class

12                 **UNITED STATES DISTRICT COURT**

13                 **NORTHERN DISTRICT OF CALIFORNIA**

14

15

16  W.A. CALL MFG. CO., INC., a California
corporation; LISA DIAZ d/b/a LEGACY
17  DANCE ACADEMY; ALILANG LLC, a
California limited liability company; and on
18  behalf of all others similarly situated,

19                    Plaintiffs,

20        vs.

21  WILINE NETWORKS INC., a Delaware
Corporation; and DOES 1 through 10,
22  inclusive,

23                    Defendants.

24

25

26

27

28

CASE NO. 4:24-cv-07141

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs W.A. Call Mfg. Co., Inc., a California corporation, Lisa Diaz d/b/a Legacy Dance Academy, and Alilang LLC, a California limited liability company (collectively, "Plaintiffs"), bring this action on behalf of themselves and all others similarly situated against Defendant WiLine Networks Inc. ("Defendant" or "WiLine").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a putative class action lawsuit against Defendant for breach of contract and unfair business practices, including the deliberate concealment of critical contract terms.

2.      Defendant has been and continues to engage in a systematic and pervasive scheme to overbill its customers by surreptitiously increasing rates in amounts in excess of the agreed upon contract rate, not providing notice of increases pursuant to Defendant's contracts with its customers, and increasing its customers' rates more frequently than is permitted by the contracts. Additionally, Defendant perpetrated an unlawful "automatic renewal" scheme to keep its customers locked into contracts by concealing the automatic renewal terms from Plaintiffs.

3.      Defendant engaged in strong-arm tactics to force Plaintiffs into keeping their service with Defendant by using threats of astronomical early termination fees calculated based on the automatic renewal terms of which that Plaintiffs were never made aware.

4.      Defendant is a nationwide company that primarily provides fixed-wireless Internet and telephony services to personal consumers, as well as to small business consumers. According to Defendant's website, "WiLine is present in 45 states and over 610 markets and growing rapidly."

5.      Defendant's website asserts Defendant is operating in every state except Maine, Nebraska, New Hampshire, South Dakota, and Wyoming, but is rapidly building out its service areas in those remaining five states.

6.      In the Customer Service Agreement ("Service Agreement") presented to its customers, Defendant made no mention of increasing the service charge rates, automatic renewal

of the contract, or a requirement to arbitrate disputes.

7.      Instead, upon the signing of Defendant's Service Agreement, a WiLine customer agrees to be bound "to this Order and Service Agreement Terms and Conditions as posted on www.wiline.com."

8.      This information is provided in the fine print using 8-point font in the Service Agreement.

9.      The language is purposely ambiguous as it is written to imply the Service Agreement's terms and conditions can be found at www.wiline.com.

10.     Plaintiffs read the sentence to mean a copy of the same terms the Plaintiffs were agreeing to in their Service Agreements could be found online.  In this reading, Plaintiffs would have no reason to assume there was a separate document of *additional* terms and conditions to be found by going to the Defendant's website.

11.     In fact, Defendant purposely withheld the *separate* Service Agreement Terms and Conditions ("Terms and Conditions") from Plaintiffs altogether.  Defendant did not provide Plaintiffs with a copy of the Terms and Conditions when it presented its Service Agreements and it cannot be found on the homepage of WiLine's website as indicated on the Service Agreements.

12.     Instead, it is buried behind two layers of the website.  The first layer is a small link at the bottom of the page that says "Legal." The second requires the customer to find a section titled "WiLine Terms and Conditions."  From there, the customer must click a link that says "Read More," which finally takes them to a PDF copy of the Terms and Conditions.  A copy of the Terms and Conditions are attached hereto as **Exhibit A**.

13.     Upon reading the Terms and Conditions, which are also printed in 8-point text, it is clear why Defendant would go to such lengths to prevent Plaintiffs from discovering its terms. The provisions serve to benefit Defendant primarily and, as expounded upon below, even require that Plaintiffs relinquish a number of their legal rights in order to be a customer of WiLine.

14.     In spite of the one-sided provisions of the Terms and Conditions, Defendant still breached them.  Plaintiffs allege Defendant increased its service charges in an excessive and arbitrary manner.

15.     The Terms and Conditions, at Section 7, provide, in part: "WiLine reserves the right, in its sole discretion, to apply an annual price adjustment to the current service fees, based on the Consumer Price Index ('CPI') as published by the United States Department of Labor, Bureau of Statistics."

16.     Despite the limitation of annual price increases in accordance with the CPI, Defendant repeatedly raised its service rates more than once annually and not in accordance with the limits imposed by the CPI.

17.     The Terms and Conditions, at Section 7, also provide, "[p]rices quoted on the Service Agreement may be subject to price adjustments. The Customer will receive at least (30) days prior written notice of any such adjustments."

18.     However, Defendant often did not provide its customers with the requisite advanced written notices of price adjustments.

19.     Plaintiffs allege that any contract provisions related to the automatic renewal of the Service Agreements were purposely hidden from them and were later revealed only to be used in Defendant's customer retention efforts after the expiration of the initial term of the Service Agreements.

20.     The Terms and Conditions, at Section 8, in 8-point text, provide, in part: "The Term of this Service will be stated on the Service Agreement.  At the end of the Initial Term, this Agreement will be automatically renewed for successive Term periods ('Renewal Term') until either party terminates this Agreement upon thirty (30) days written notice which will commence at the start of the next billing cycle.  Such written termination notice must be sent to contracts@wiline.com and may be liable for Early Termination Charges as detailed in Section 9."

21.     Defendant effectively enrolled Plaintiffs and the Class into a contract that automatically renews its services for the same term length as the initial contract term.  For

instance, if a customer that enrolled in a five-year contract does not send a termination notice to WiLine thirty (30) days before the five-year period is over, they will be locked into an additional five-year term.

22.     Such a provision violates a numerous laws designed to protect consumers from deceptive practices, requiring notices of service rate increases and renewals to be just and reasonable.

23.     Defendant implemented a negative option renewal into its Terms and Conditions, which meant if the customer did nothing, Defendant would automatically renew the contract term even if it did not receive its customers' affirmative consent to these terms.

24.     Making matters worse, Defendant did not provide Plaintiffs with any prior notice of Plaintiffs' automatic renewal of the Service Agreements.

25.     Defendant did not offer any means for Plaintiffs to opt-out of the automatic renewal, only providing cancellation instructions and the concealed Terms and Conditions after Plaintiffs attempted to cancel their services with Defendant.

26.     Plaintiffs were caught off guard at this point because they were not expecting their contracts to be automatically renewed or to be confronted with an exorbitant early termination fee.  The early termination fees were based on a calculation of the current service fees multiplied by the number of months remaining of the automatically renewed term.

## **PARTIES**

27.     Plaintiff W.A. Call Mfg. Co., Inc. is a California corporation with its principal place of business located in San Jose, Santa Clara County, California.

28.     Plaintiff Lisa Diaz is a citizen of El Segundo, Los Angeles County, California.

29.     Plaintiff Alilang LLC is a California limited liability company with its principal place of business located in Anaheim, Orange County, California.

30.     Defendant WiLine Networks Inc. is a Delaware corporation with its principal place of business located in Princeton, New Jersey with a satellite office in Redwood City, California.  Defendant markets to both business and personal consumers via its website located

at www.wiline.com.  Defendant sold its broadband Internet and telephony services throughout the State of California at all times during the Class Period.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1331.  The aggregate amount in controversy exceeds $75,000, exclusive of interest and costs; there are at least 100 members of the putative class; and Plaintiffs, as well as the members of the proposed class, are citizens of a state different from Defendant.  Plaintiffs also bring a federal claim.

32.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from the State of Delaware.  Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons or entities in the State of California.  Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

34.     Furthermore, the Terms and Conditions specify a choice of law and venue for disputes between the contracting parties: "This Agreement shall be governed by the laws of the State of California without regard to its conflict of law provisions with venue lying in the federal and state courts of Alameda County, California."

35.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## FACTUAL ALLEGATIONS

**A.  The Broadband Internet Market in America**

36.     Previously, a lack of competition and consumer choice in the broadband provider market, which had been restricted to cable and telco providers, has been raised as the primary

reason Internet costs can be high and speeds and access can be poor even in urban areas[1].

37.    To remedy this anti-competitive climate, government agencies have worked to minimize costs that entrants may incur. The Telecommunications Act of 1996 expanded access rights to pole attachments for ISPs with federal subsidies in an effort to encourage provider participation[2].

38.    In 2015, the Federal Communications Commission ("FCC") granted a preemption petition requested by local utility boards in North Carolina and Tennessee over the state laws that, as a result of private provider lobbying, had legally prevented municipalities from entering the broadband market[3].

39.    To reduce costs and expand the market, the FCC also approved a "Dig Once" policy—a mandate that requires cities to implement broadband conduits during construction of federally-funded roads[4].

40.    Because the financial expense of laying down fiber constitutes such a large portion of deployment costs, measures sympathetic towards this step of entrance make it easier for broadband providers to invest in infrastructure.

41.    Wireless Internet service providers, also known as fixed wireless access providers, such as WiLine, eliminate the need for and the costs of point-to-point cabling by delivering broadband Internet services through wireless networking technology.  They can even supply speeds up to 10Gbit/s of synchronous download and upload speeds[5].

---

[1] Fletcher, J. (May 11, 2023) *The History of US Broadband, S&P Global Homepage*. Available at: https://www.spglobal.com/marketintelligence/en/news-insights/research/the-history-of-us-broadband (Retrieved August 30, 2024).
[2] Telecommunications Act of 1996, Pub. L. No. 104-104, tit. II, 110 Stat. 56 (February 8, 1996) (codified as amended in 47 U.S.C. § 151, *et seq*.).
[3] *FCC Releases Order Preempting TN & NC Municipal Broadband Restrictions.*  Federal Communications Commission, December 9, 2015. Available at: https://www.fcc.gov/document/fcc-releases-order-preempting-tn-nc-municipal-broadband-restrictions (Retrieved August 26, 2024).
[4] Office, U.S.G.A. (June 27, 2012) *Planning and flexibility are key to effectively deploying broadband conduit through Federal Highway Projects*, U.S. GAO. Available at: https://www.gao.gov/products/gao-12-687r (Retrieved August 26, 2024).
[5] WiLine (January 2024) *Fixed-Wireless vs Fiber - Which is Best?, WiLine*. Available at: https://www.wiline.com/blog/fixed-wireless-vs-fiber/ (Retrieved August 30, 2024).

42.    In 2015, the FCC defined broadband as any connection with a download speed of at least 25 Mbit/s and an upload speed of at least 3 Mbit/s, though the definition has used a slower speed in the past[6].

43.    In 2018, 73.0% of households had access to 25Mbps downstream with 3Mbps upstream speeds from only one or two fixed-broadband providers, and only 21.6% had access from three or more providers.  In 2021, only 29.1% of households had access from one or two providers while 69.3% were served by three or more providers.  Thus, the number of households served by three or more providers increased by 47.7 percentage points from 2018 through 2021[7].

44.    By 2021, the Carmel Group, which offers consulting for the telecom, media, technology, and entertainment industries, estimated that there was a minimum of 2,800 fixed-wireless-centric operators, like WiLine, in the United States[8].

45.    With growing options for broadband Internet access in America, broadband providers have made it intentionally confusing for their users to cancel Internet service[9], sometimes outright refusing to allow customers to cancel their service[10].

46.    Defendant has taken the measures employed by other broadband providers struggling to keep customers to another level.  Once enrolled into broadband and/or telephony services with WiLine, it would raise Plaintiffs' service fees at improper intervals and for amounts in excess of the agreements it entered into with Plaintiffs.  When Plaintiffs attempted to

---

[6] *The FCC has set a new, faster definition for broadband*, Brian Fung, The Washington Post, January 29, 2015. Available at: https://www.washingtonpost.com/news/the-switch/wp/2015/01/29/the-fcc-has-set-a-new-faster-definition-for-broadband/ (Retrieved August 26, 2024).

[7] *2022 Communications Marketplace Report*, GN Docket No. 22-203 (Dec. 30, 2022) at Fig. II.A.28, available at https://docs.fcc.gov/public/attachments/FCC-22-103A1.pdf.  (Retrieved August 26, 2024).

[8] Schaeffler, Jimmy, *Liftoff! Internet Service Providers Take Flight with Fixed-Wireless and Hybrid Networks*, The Carmel Group, April 4, 2021.  Available at: https://www.wispa.org/media/v1/543/2024/01/2021_WISPA_Report_FINAL-compressed.pdf (Retrieved August 26, 2024).

[9] *Ready to ditch your internet provider?  Here's a Step-By-Step Guide on Canceling Your Internet Service* (August 18, 2024) CNET. Available at: https://www.cnet.com/home/internet/ready-to-ditch-your-internet-provider-heres-a-step-by-step-guide-on-canceling-your-internet-service/ (Retrieved August 26, 2024).

[10] *Comcast Apologizes for 'Unacceptable' Customer Service Call That Won't* End (July 15, 2014) ABC News. Available at: https://abcnews.go.com/Business/comcast-apologizes-unacceptable-customer-service-call-end/story?id=24567047 (Retrieved August 26, 2024).

cancel broadband Internet services with Defendant, Defendant would inform Plaintiffs that it had automatically renewed the contracts, which would then subject Plaintiffs to exorbitant early termination fees, if they were going to proceed with cancellation.

**B. The Telephone Market in America**

47.     Similarly, the history of telephone service in America is marked with periods of little competition to forced market competition through antitrust action and ultimately feverish levels of competition brought about by new technologies and innovation.

48.     Shortly after the invention of the telephone starting from 1881 and running through 1899, the American Bell Telephone Company had a monopoly on telephone services in the United States[11].

49.     AT&T was the successor to the American Bell Telephone Company and due to various federal agreements, AT&T maintained a near monopoly on telephone service in the United States from 1899 to 1982.

50.     In 1974, the United States Department of Justice filed an antitrust lawsuit against AT&T.  By August 1982, after a consent decree between AT&T and the United States Department of Justice, the AT&T corporate structure was divested into seven regional holding companies[12], colloquially known as "Baby Bells."

51.     Starting in 1972, adoption of mobile telephones that could be installed in cars, vehicles, and carried around in portable bags was just starting to grow[13].

52.     Thirty years later, by 2002, the Pew Research Center found approximately 62% of American adults owned a mobile phone.  Twenty years later, by 2023, that percentage had grown to 97%[14].

53.     The advent and the steady adoption of the modern-day cell phone sparked an inverse relationship with the number of telephone landlines subscriptions in the United States.

---

[11] Brooks, John (1976). *Telephone: The first hundred years*. Harper & Row. pp. 73–105.
[12] *United States v. American Telephone and Telegraph Company*, 552 F.Supp. 131 (1982).
[13] U.S. Patent No. 3,663,762 (Issued May 16, 1972).
[14] *Mobile Fact Sheet* (January 31, 2024) Pew Research Center. Available at: https://www.pewresearch.org/internet/fact-sheet/mobile/ (Retrieved August 30, 2024).

At its peak in 2000 there were 192 million landline subscriptions.  By 2023, that number had fallen to less than half with only 87.99million landline subscriptions[15].

54.     Meanwhile, the popularity of Voice-over-Internet-Protocol (VOIP) exploded in the 2010s, as a result of lower costs and low barriers to entering the market.  In 2010, there were only 6.2 million business VOIP lines and 28 million residential VOIP lines being used in the United States.  By 2018, those numbers had grown to 41.6million business VOIP lines and 76.6million residential VOIP lines[16].

55.     The number of VOIP providers, like WiLine, is innumerable, because they are merely resellers of large-scale VOIP wholesalers like Bandwidth.com[17].

56.     Companies such as Alphabet/Google, Microsoft, Verizon Communications, AT&T/RingCentral, Cisco Systems, Zoom, Twilio, Vonage, and Dialpad actually dominate the VOIP market[18].

57.     With a highly competitive VOIP landscape, Defendant, in lockstep with how it handled its broadband Internet service contracts, employed the same tactics to extract more money from Plaintiffs than it was entitled.   Defendant imposed automatic renewal terms on Plaintiffs, while simultaneously hiding those contract provisions from Plaintiffs.

**C. Automatic Renewals**

58.     Automatic renewal clauses, also referred to as an evergreen clause, act to automatically renew the terms of an agreement at the end of a subscription period, except when the contract is terminated, such as by mutual agreement or contract breach.

59.     Defendant did not include an automatic renewal clause in the Service Agreements it presented to Plaintiffs.  Instead, it went to great lengths to hide its Terms and Conditions and

---

[15] Taylor, P. (August 22, 2024) *Fixed telephone subscriptions in the U.S. 2023*, *Statista*. Available at: https://www.statista.com/statistics/187241/number-of-fixed-telephone-lines-in-the-united-states-since-2000/ (Retrieved August 30, 2024).
[16] Joshi, S. (February 5, 2024) *50 VoIP Statistics to Reveal the Future of Phone Systems*, *Learn Hub*. Available at: https://learn.g2.com/voip-statistics (Retrieved August 30, 2024).
[17] See, https://www.bandwidth.com/products/voip-origination/ .
[18] Research and Markets Ltd. (April 2024) *Voice over Internet Protocol (VOIP) Services Global Market Report 2024*, *Research and Markets - Market Research Reports*. Available at: https://www.researchandmarkets.com/reports/5954573/voice-over-internet-protocol-voip-services (Retrieved August 30, 2024).

the automatic renewal language from Plaintiffs.

60.    Defendant purposely did not present Plaintiffs with a copy of the Terms and Conditions.  Instead, it used intentionally ambiguous language, in small 8-point text, to refer Plaintiffs to www.wiline.com for the "Service Agreement Terms and Conditions."

61.    However, the Terms and Conditions cannot be found at the landing page of www.wiline.com.  Instead, the Terms and Conditions are buried beneath two layers of Defendant's website.

62.    Defendant did not receive Plaintiffs' affirmative consent to the automatic renewals, which is also known as negative option marketing.  It is the condition that allows a provider to take a customer's silence or failure to take an affirmative action, as acceptance of an offer.

63.    Defendant did not present to Plaintiffs the automatic renewal language in a manner that was just and reasonable.

64.    Defendant also did not present to Plaintiffs a simple means to opt-out or cancel their automatic renewal of the contract, such as a link accessible on its website.

**D.  The Communications Act of 1934 and the Telecommunications Act of 1996**

65.    There are regulations that protect personal and business consumers from billing and automatic renewal practices that are unjust and unreasonable.

66.    As a telecommunications company registered with the FCC as a common carrier that holds itself out to the public for hire to provide communications transmission services, Defendant is bound by the statutory framework provided by the Communications Act of 1934, and as amended by the Telecommunications Act of 1996.

67.    The Telecommunications Act of 1996 is a federal law enacted by the 104th United States Congress on January 3, 1996, and signed into law on February 8, 1996.  It primarily amended Chapter 5 of Title 47 of the United States Code.  The act was the first significant overhaul of United States telecommunications law in more than sixty years, amending the Communications Act of 1934, and represented a major change in that law, because it was the first time that the Internet was added to American regulation of broadcasting and telephony.

68.     The primary goal of the law was to "let anyone enter any communications business – to let any communications business compete in any market against any other."

69.     However, Congress was careful to build in protections for consumers.  The statute titled "Service and charges" provided, in part, "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful[]."  47 U.S.C. § 201(b).

70.     Congress also wanted consumers to have a mechanism to keep providers of telecommunications services accountable.  The Telecommunications Act of 1996 allows "[a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies."  47 U.S.C. § 207.

71.     "In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this Act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this Act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this Act, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."  47 U.S.C. § 206.

72.     Plaintiffs allege that the charges Defendant placed on its customers' bills were unjust and unreasonable.  The service charges billed by Defendant were not agreed upon by the parties and the charges did not comport with the terms of the Service Agreements with Plaintiffs.

73.     Plaintiffs further allege the automatic renewal practices employed by Defendant, which include concealing the Terms and Conditions from Plaintiffs, to be unjust and unreasonable.

**E.  Defendant's Online Complaints Are Indicative of Its Unlawful and Unfair Practices**

74.    Defendant's customers have been submitting online complaints about WiLine ranging from hiding contract terms to arbitrary price increases to a failure to follow its contract terms and a failure to provide the services that were contracted.

75.    Plaintiffs, like the reviewers, are similarly surprised that their contracts were automatically renewed and by their inability to cancel their contracts without paying an exorbitant early termination fee.

76.    Some reviews even complain about emailed cancellation requests being ignored by Defendant.  Some examples of complaints from Defendant's customers follow below.

77.    Review from https://www.complaintsboard.com/wiline-networks-b135649 :

**E. Considine**
Verified customer

Resolved     Replied

**Our Medical Group signed a 3 year contract for phone service**

Our Medical Group signed a 3 year contract for phone service. We were not aware that the 3 year contract would automatically renew for an additional 3 years. In the 5th year we requested to cancel the contract beause they were not delivering the service that was promised in the contract-over 35 service tickets were put in and they never got to the bottom of the issue. When we asked to cancel they charged an early term fee of $4200. They continued to charge our credit card on file even though we asked them not to. A dispute filed with our Credit Card Company was honored, but now they want to take us to court for $4200. They stated the service tickets are not being acknowledged because we never requested a credit on our account for the interuption of services. We were not aware that this was something we were supposed to request. The early term fee should be waived because they did not live up to their end of the contract--to provide proper phone service.

78.    Review from https://www.complaintsboard.com/wiline-networks-b135649 :

**JFPaloAlto** of Palo Alto, US
Nov 09, 2023 | 12:14 pm EST | Verified customer

**Bill increased greater than 20% and the cpi increase max**

Contracted with wiline early 2020, billing started going up in 2022 though we have a contract. We sent letter terminating contract at end of the terms of signing. Indicated Wiline should come collect their equipment. Contracts at Wiline dot come does not answer. Our accounting dept. overlooked our credit card on file and Wiline has been billing and never canceled the contract. The rate has gone up 66%. After repeated emails to contracts, to billing, and sales. Followed by many calls to sales and billing and customer support where they also emailed contracts, we still cant get ahold of anyone.

I now have heard they are likely to file for bankruptcy and are having a hard time making payroll. This might explain my experience. I implore someone at Wiline to contact me and help here.

79.     Review from https://www.complaintsboard.com/wiline-networks-b135649 :

 **WiLine Networks review:** Automatic contract renewal without notice and large price increases 

 **Evatng** of Milpitas, US
Oct 04, 2023 | 8:44 pm EDT | ⊘ Verified customer

⊙ Featured review

Our company signed up with Wiline in 2017 for a three year internet service contract (acct #921405). In May 2023, our contract auto renewed for three more years. We pay the charges on an annual basis to take advantage of the discount Wiline offers. In Nov 2022, we paid $2,390.82 based on Wiline's invoice covering service period 1/1/23 - 12/31/23. We thought the payment would cover the charges to the end of 2023. However, right after we sent in the annual payment, Wiline raised the monthly charge by 8% in Dec 2022, and then raised the charge again by 13.3% in Jun 2023. Our monthly charge went from $199.23 to $247.65 in less than 7 months, an increase of more than 24%. We emailed and called the billing and contract department at Wiline about the large and rapid increases. The manager tells me the increases are allowed by the contract; if we want to cancel the contract, we'd owe more than $8,000 as our contract just renewed in May. The company is unwilling to offer us any options even though we have been a customer for more than 6 years. This is a very deceptive business practice because Wiline sends us an invoice showing the service period and the amount for a 12 months period. After that, we got a one liner notification on the back page of the statement "Rate Change Notice". There's no detail of what % and how often. We feel we have no ability to budget our internet expenditures because Wiline can increase the charge anytime for any amount.

///

///

///

PLAINTIFFS' CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

80.    Review from https://www.complaintsboard.com/wiline-networks-b135649 :

**Protech Products** of Ontario, US
Aug 01, 2023 | 3:44 pm EDT | ✓ Verified customer

### 22,464.74 to get out of WiLine Contract

We Got WiLine in 2017 for a 3 year contract, Like most people we did not know it was an auto renewal because the Customer service Agreement for Data and Voice that you sign did not come with the full Terms of Agreement. The forms have a "as posted on www.wiline.com" in the fine print for their service agreement, but they never have you actually sign or initial the service agreement paper that reference the auto renewal.

Anyways after 6 years of on time payments, and multiple outages, I tried cancelling our service at the end of July only to be told that it auto renewed for 3 more years just a couple of weeks before our request and it would cost me 22,464.74 to pay off the Data and Voice contracts for 3 years. It probably doesn't matter very much, but they show we started 7/16/2017, but we show our first bill had our first call go out on 8/16/2017 a month after they show. We were on Hot Spots prior to that.

I asked if there was anything I could do and was told no, they could only renegotiate what I was paying monthly... for a better price... I went from 20mbps in 2017 dedicated at about 350.00 a month to This past bill being over 640.00 for the same 20mbps... A new company offered me almost 50% off that price and 100mbps so we went with them.

22,464.74 cancellation for a contract that I did not know was on automatic renewal is obscene... When I see others buying out way cheaper... Before I put this complaint on this site ( and possibly others soon) I asked the rep if there was any other options and he said no, only negotiating a lower price. Otherwise I never would've posted this had they said anything other then no.

WiLine needs people to sign that agreement term and not a paper that says go to our website to see the terms (if they haven't changed that already) also they should be like Lease companies who tell you 60 days in advance that your lease is set to Renew for another year.

The fact that the price can go up 10 months out of 12 months every year lead us to believe we were on a Month to Month contract after the first year...

Missing the auto renewal date by 30 days should lead to a full 3 year buy out. that is brutal, how can that be justified?

81.    Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/complaints :

| | | | |
|---|---|---|---|
| 👤 | **Initial Complaint** 06/05/2023 | **Complaint Type:** | Service or Repair Issues | **Status:** Answered  |

WiLine failed to provide services per the contract.essentially breach of contract and now they are trying to collect early termination fees

82.    Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/complaints :

| Initial Complaint 06/24/2024 | Complaint Type: | Service or Repair Issues | Status: Answered ❓ |
|---|---|---|---|

We are/were contracted with Wiline for internet services. From January 6 - January 10, 2024 the service was completely down, and the company was slow to respond/resolve this issue. For the month of February 2024 the service was so slow it was unusable, and the promised speeds were not reached. After reaching out in early February 2024 Wiline stated they did not have a solution, so we were forced to seek out another service to keep our business operating. We then requested a release from our contract, since they did not meet the requested internet speeds, and they are refusing to let us out of our contract. Wiline is billing us for roughly $7400 for an early termination fee, and we would like this fee waived, as they did not provide the service we signed up for.

83.    Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/complaints :

| Initial Complaint 07/09/2024 | Complaint Type: | Customer Service Issues | Status: Unresolved ❓ |
|---|---|---|---|

Numerous attempts via phone and email have been placed to Wline to terminate our account. *********************** has not processed our request.We want to terminate our service - Contract understood and payoff amount understood. Wiline is dragging this out way more than needed

///

///

///

1

84.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-

2  providers/wiline-networks-inc-0221-90048461/customer-reviews :

3

4        Ira B.

5                                                            08/29/2022

6      Sent 7/11/22 I am reaching out because this company has for a lack of better
       words trap us. Between price increases, termination fees and/or never ending
7      contract. We understand there are reasonable increases to rates over time. But
       what are options are, just are unreasonable. Our bill increased within one month
8      of signing the last contract shown in our first bill which was the quote we accepted
       11/1/21 $230 broadband $60 final bill $315, one month into having the service our
9      bill increased date 12/1/21 to $244.26 broadband and $63 final bill $335 which
10     was also the last month to increase 12% before 2022. Then again in June we get
       hit with another 12% increase final bill $375 only 6 months after. Mind you are not
11     given a proper notice other than link on the bottom of the bill that leads you a
       statement saying that it in summary "you can raise the rate 12% at any time". All
12     together our bill has increased of 20% in less than a year. We reach out due to the
13     fact that these increases are happening ridiculously fast and way to high. We
       come to find out that the Termination Fee is over $10,000, making the month
14     payment higher than what we pay now. Our next step was to be directed to
       Services and Event. He kindly offers us our original rate. This is where I say a
15     never ending contract. Come to find out if we agree to this new contract our 36
16     month term restarts leading to more increases and never being able to afford to
       pay the early termination fee. If we stick with our current contract or start a new
17     one with how fast you are raising our rates we potentially will be paying $526 a
18     month. That is 66% higher than what we signed. I hope you can see that is a
       financial burden we can not afford to take on. I hope you can how it is not fair to
19     raise the rates that quickly, and at such a high percentage, forcing us to go in debt
20     to cancel or forcing us to sign another commitment of 36 months leading us to the
       same or leaving us unaffordable monthly never ending contract
21

22  ///

23  ///

24  ///

25

26

27

28

PLAINTIFFS' CLASS ACTION COMPLAINT

85.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/customer-reviews :



Jeff H
⭐☆☆☆☆                                               12/21/2022

By far the most scandalous and dishonest company I have ever hired. From the installation, to the service has been an absolute nightmare. They are in the business of s******* over businesses and taking advantage of people. We really had no other option, and signed on with Wiline in good faith that they would be able to honor their end of the agreement and provide a consistent and reliable source of internet a phone service. We have lost thousands of dollars due to having them, and I would not recommend them to anyone. Their rate increases are absurd, and they continue to up our rates MONTHLY. We got locked into a 4 year contract and are halfway through it. We are already paying nearly double what we had originally agreed upon. This is a company that will cross the wrong person one day, and lose everything in a legal battle.

86.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/customer-reviews :



David M
⭐☆☆☆☆                                               04/17/2023

Small business owner who strongly recommends that you avoid making the same mistake. My advice to ALL would be never do business with WiLine Networks. Never have I done business with a business this bad. Between the rampant packet loss, unstable connection and under delivering on the contracted speed rates, this is just the beginning. Never sign a contract with this company, they're a joke. There's no value in signing a contract because WiLine adjusts the bill whenever the wind blows without notice or cause. Not having internet might have been a better option to this very poor company.

///

///

///

PLAINTIFFS' CLASS ACTION COMPLAINT

87.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/customer-reviews :

 **Vincent s** 

04/24/2023

Review of Service: I was surprised a business tailoring to small businesses would have soo much down time. Price:STAY AWAY.... STAY AWAY.... they lock you in with a reasonable price the first year and then just start increasing your rate at a ridiculous amounts. Their contract states they can raise the price to anything they want at anytime long as they give you a 30 day notice. And they also have CPI (inflation) increases which can happen more than once in an given year. Happened to us!01.2021-started contract 12.2021-CPI increase 6.2%03.2022-CPI increase 7.9%03.2023-CPI increase 6.4%In their contract, it states they can raise the rates at anytime. so they did... (on top of CPI increase)06.2022-Rate increase 12%12.2022-Rate increase 8%03.2023-Rate increase 6.5% (On top of CPI)Imagine your internet bill goes from $1,100 to $1,700 within 18 months!.. per location....I don't even know what what the rate will be by end of our contract. And if you terminate early, they want their early termination fee.Stay away from the headache.

88.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/customer-reviews :

 **Aaron P** 

08/08/2023

This company has fine print not on the contract page but in a document referenced on the contract that they can unilaterally raise prices as much as they want whenever they want. You will not be able to get out of the contract until it is over even if they raise the prices

///

///

///

89.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/customer-reviews :



Keith C.

☆☆☆☆☆

09/25/2023

WiLine is a nightmare to non-profit organization and small business. Their service is not stable, and too much downtime. In the beginning, they provide you a reasonable price , and then unreasonable to raise the price. Same as other customer review situation, ********************** always use their terms and conditions - section 7 to find excuses for their price increase, i.e. CPI, local access fee..... ,etc. They first raised our price after 7 months we signed the contract and then raised it again 4 months later. I am appreciated if anyone can tell us how to legally fight back or any method to stop this ridiculous terms for price increase. What they do is constantly harming our cash flow and increasing our financial burden under this uncertainty economic environment.

90.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/customer-reviews :



George P

☆☆☆☆☆

01/24/2024

Wiline contract is nothing but a big rip off, they have auto renewal hidden in their contract (page 7) even when on the front of the agreement you sign for a two year term. The sales person never mention the auto renew. Just to let people know that they do have an office in ********* if anyone wants to file a claim or taken them to court has I plan to.

///

///

///

PLAINTIFFS' CLASS ACTION COMPLAINT

91.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/customer-reviews :



Natascha D

⭐☆☆☆☆                                                        03/16/2024

I can't believe that they are still able to do business , with their unlawful practices of autorenewals . This is the worst company I have ever worked with . For years I had to endure their overpriced rates and terrible service . even during the pandemic and 16 months state mandated lockdown , I paid and they tricked me into a new contract . Now after the company and **** ( my POC ) knew that I am unhappy and will not continue , I was auto renewed . My business is closed and they are still demanding money. Honestly , are you out of your minds ?? Their communication is pure harassment and scare tactic . Not this time , 12 years of service , Enough is enough !

92.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-providers/wiline-networks-inc-0221-90048461/customer-reviews :



Ariel L

⭐☆☆☆☆                                                        05/13/2024

WiLine auto-renewed our company's contract for 25 months without informing us that our existing contract with them expires on 06/01/2024 and asking us if we want to renew.Our team contacted them on 5/10/2024 to cancel our contract with them, but they told us that the contract has auto-renewed already. They told us that our new contract term is from 06/01/2024 to 07/01/2026, and if we want to cancel, we would need to pay an early termination fee of $51,205.We asked them if there's anyway they can reduce the termination fee for us and we were told that there are 2 options - relocate the service or sign up for a longer contract. We're a small startup company so relocating the service is not an option for us. The other option they gave us is signing up for either a 38 months or 50 months contract with them. As a small startup company, we can't sign up for long contracts like this, nor do we have $51K readily available to pay them in early termination fee. WiLine pricing is 10X higher than what we're paying with another supplier. Given their high price point and poor customer service, I would not recommend them to anyone.

93.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-
providers/wiline-networks-inc-0221-90048461/customer-reviews :



Jessie Y

⭐☆☆☆☆                                                        05/07/2024

WiLine Networks proves itself to be an unscrupulous and deceitful entity. In brief,
our experience with their service, initiated in 2015 for a 5Mbps Data plan, has
been riddled with persistent issues like sluggish internet speeds and poor phone
line quality. Despite our grievances, WiLine consistently escalated monthly fees
without addressing our concerns. Upon discovering that the actual speed was
merely 2Mbps, as verified by independent tests, and realizing we were
overcharged at $438.91 monthlytriple the market ratewe terminated our contract
in November 2022. WiLine's response? A staggering cancellation fee demand of
$9,004.11.Left with no recourse, we pursued legal action, filing a case in CA small
claims court for "Breach of Contract-Failure ******************* against WiLine. Their
absence at the Feb. 17, 2023 court hearing led to a judgment in our favor,
awarding $4,455, supported by irrefutable evidence. However, WiLine evaded
payment, impervious to our attempts to reach them via phone calls, mail, or email,
redirecting us to various departments.Multiple subsequent court hearings were
necessitated to secure payment, yet WiLine consistently failed to appear. Such
behavior epitomizes a flagrant disregard for business ethics.In summary:- WiLine
fails to deliver on its promises. They are not capable of what's been promised.-
Arbitrary price hikes characterize their business practices.- Their tactic of
ensnaring unsuspecting customers into auto-renewal without proper notice
violates California Assembly Bill *** 390, Chapter 450.- When confronted with their
faults, WiLine adopts a strategy of evasion.WiLine Networks appears to be an
unreliable and untrustworthy telecommunications company. They fail to deliver
promised services, exhibit poor customer service, engage in deceptive billing
practices, and evade responsibility when confronted with grievances. Overall,
their behavior reflects a lack of integrity and ethical business conduct.

94.     Review from https://www.bbb.org/us/nj/princeton/profile/internet-
providers/wiline-networks-inc-0221-90048461/customer-reviews :



Carolina C

⭐☆☆☆☆                                                        06/05/2024

WiLine is the worst internet provider!!! The auto-renewal is the biggest scam.DO
NOT USE WILINE BEWARE

95.     Defendant maintains an "F" rating with the Better Business Bureau ("BBB"), which is the lowest possible rating the BBB assigns to businesses.

96.     As of the filing of this Complaint, there are 150 one-star reviews for WiLine on Yelp! originating from users in California, Washington, Nevada, New York, Hawaii, New Jersey, Oregon, Texas, Florida, Louisiana, and Michigan.  The majority of the complaints come from reviewers in California.  The complaints largely range from being blindsided by Terms and Conditions that they were not made aware of to being billed in excess of their contract terms. See, https://www.yelp.com/biz/wiline-networks-redwood-city?rr=1 ; https://www.yelp.com/biz/wiline-networks-san-diego?rr=1 ; https://www.yelp.com/biz/wiline-networks-sacramento?rr=1 ; and https://www.yelp.com/biz/wiline-networks-los-angeles?rr=1 .

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

a) **W.A. Call Mfg. Co., Inc.**

97.     Plaintiff W.A. Call Mfg. Co., Inc. ("W.A. Call") entered into a Customer Service Agreement – Voice with WiLine on or about July 6, 2020.  The terms of the Customer Service Agreement – Voice were that WiLine would provide W.A. Call with four phone lines for a total of $100.00 per month.

98.     W.A. Call also entered into a Customer Service Agreement – Data with WiLine on or about July 6, 2020.  The terms of the Customer Service Agreement – Data were that WiLine would provide W.A. Call with 50Mbps of broadband Internet service for the recurring cost of $300.00 per month.  Both of the Customer Service Agreements entered into by W.A. Call are attached as **Exhibit B**.

99.     Despite the limitation of annual price increases in accordance with the CPI, Defendant repeatedly raised its prices more than once annually and not in accordance with the limits imposed by the CPI.  During the three years and six months period between July 6, 2020 through December 31, 2023, Defendant increased W.A. Call's service charges seven (7) times, an average of two times per year.

100.     The United States Bureau of Labor Statistics reported the annual CPI rates as follows since 2020: 1.2% (ending 2020); 4.7% (ending 2021); 8.0% (ending 2022), and 3.4% (ending 2023).

101.     Defendant increased its service fees to W.A. Call by the following percentages on each Service Agreement since 2020 as follows: 5.40% (from $435.60 to $459.12) on September 1, 2021; 12.0% (from $459.12 to $514.21) on June 1, 2022; 8.95% (from $514.21 to $560.24) on September 1, 2022; 8.0% (from $560.24 to $605.06) on December 1, 2022; 8.0% (from $605.06 to $653.47) on June 1, 2023; 3.05% (from $653.47 to $673.40) on September 1, 2023; and 7.50% (from 673.40 to $723.89) on December 1, 2023.

102.     Defendant increased its service rates by 5.40% in 2021 when the CPI was 1.20% ending in 2020.  Defendant increased its service rates by a combined 28.95% in 2022 when the CPI was 4.70% ending in 2021.  Then, Defendant increased its service rates by a combined 11.55% in 2023 when the CPI was 3.40% ending in 2022.

103.     In addition to the adjustments being made too frequently in violation of the Terms and Conditions' provisions limiting increases to once per annum, the adjustments far exceeded the published annual CPI rates.

104.     The Terms and Conditions at Section 7 also provide, "[p]rices quoted on the Service Agreement may be subject to price adjustments. The Customer will receive at least (30) days prior written notice of any such adjustments."

105.     However, Defendant only provided W.A. Call with advance written notices of price adjustments prior to the rate increases of December 1, 2022 and December 1, 2023. Defendant failed to provide any notice whatsoever for the other five increases.

106.     Every service rate increase was defective because it either: 1) lacked the requisite 30-day advance notice; 2) was an increase that was within a year of another rate increase; or 3) was in excess of the CPI rate.

107.     Accordingly, W.A. Call is owed at least $3,560.96 in restitution for overbilled service fees.

108.   W.A. Call was not provided with a copy of the Terms and Conditions at the inception of its contracts with Defendant.

109.   Nevertheless, Defendant has made demand for $24,068.37 in early termination fees based on the automatic renewal provisions of the same Terms and Conditions that W.A. Call was not initially provided with.

110.   Defendant has hired Richard T. Avis, Attorney & Associates, LLC to collect the purported debt.

111.   Richard T. Avis, Attorney & Associates, LLC is not registered with the California Department of Financial Protection and Innovation to collect debts in the State of California.

**b) Lisa Diaz d/b/a Legacy Dance Academy**

112.   Plaintiff Lisa Diaz ("Diaz") is a small business consumer doing business as Legacy Dance Academy.

113.   Diaz entered into a Customer Service Agreement – Voice with WiLine on or about September 26, 2019.  The terms of the Customer Service Agreement – Voice were that WiLine would provide Diaz with one phone line for a total of $10.00 per month.

114.   Diaz also entered into a Customer Service Agreement – Data with WiLine on or about September 16, 2019.  The terms of the Customer Service Agreement – Data were that WiLine would provide Diaz with 95Mbps downstream and 15Mbps upstream of broadband Internet service for the recurring cost of $140.00 per month.  Both of the Customer Service Agreements entered into by Diaz are attached as **Exhibit C**.

115.   Despite the limitation of annual price increases in accordance with the CPI, Defendant repeatedly raised its prices more than once annually and not in accordance with the limits imposed by the CPI.  During the four years and eight months period between October 1, 2019 through May 31, 2024, Defendant increased Diaz's service charges eight (8) times, an average of 1.7 times per year.

116.   The United States Bureau of Labor Statistics reported the annual CPI rates as follows since 2019: 1.8% (ending 2019); 1.2% (ending 2020); 4.7% (ending 2021); 8.0% (ending 2022), and 3.4% (ending 2023).

117.     Defendant increased its service fees to Diaz by the following percentages on each Service Agreement since 2019 as follows: 1.90% (from $163.25 to $166.45) on November 1, 2020; 5.40% (from $166.45 to $175.44) on November 1, 2021; 12.0% (from $175.44 to $196.49) on June 1, 2022; 8.21% (from $196.49 to $212.62) on November 1, 2022; 7.99% (from $212.62 to $229.61) on December 1, 2022; 8.0% (from $229.61 to $247.99) on June 1, 2023; 11.48% (from $247.99 to $276.46) on November 1, 2023; and 3.68% (from 276.46 to $286.62) on March 1, 2024.

118.     Defendant increased its service rates by 1.90% in 2020 when the CPI was 1.80% ending in 2019.  Defendant increased its service rates by 5.40% in 2021 when the CPI was 1.20% ending in 2020.  Defendant increased its service rates by a combined 28.20% in 2022 when the CPI was 4.70% ending in 2021.  Defendant increased its service rates by a combined 19.49% in 2023 when the CPI was 8.0% ending in 2022.  Then, Defendant increased its service rates by 3.68% in 2024 when the CPI was 3.40% ending in 2023.

119.     In addition to the adjustments being made too frequently in violation of the Terms and Conditions' provisions limiting increases to once per annum, the adjustments far exceeded the published annual CPI rates.

120.     Of particular note is the increase that took place on March 1, 2024 was actually an increase of 44.98% to the Local Access Fees.  The access fees were increased from $22.59 to $32.75 per month.

121.     This contravenes the provisions of the two Service Agreements Diaz entered into with Defendant.  In a section titled Payment Terms at ¶3, it states, "WiLine may charge a recurring access fee not to exceed 8.9% of Services charges to recover costs associated with providing WiLine Service to the building."

122.     Starting March 1, 2024, the Local Access Fees totaled $32.75 when the Services charges amounted to $253.87.  That equates to the access fees representing 12.9% of the Services charges, which is more than the 8.9% allowed by the Service Agreements.

123.    The Terms and Conditions at Section 7 also provide, "[p]rices quoted on the Service Agreement may be subject to price adjustments. The Customer will receive at least (30) days prior written notice of any such adjustments."

124.    However, Defendant only provided Diaz with advance written notices of price adjustments prior to the rate increases of June 1, 2022 and November 1, 2022.  Defendant failed to provide any notice whatsoever for the other six increases.

125.    Every service rate increase was defective because it either: 1) lacked the requisite 30-day advance notice; 2) was an increase that was within a year of another rate increase; 3) was in excess of the CPI rate; or 4) exceeded the maximum allowable access fee to services charge ratio.

126.    Accordingly, Diaz is owed at least $1,979.80 in restitution for overbilled service fees.

127.    Diaz was not provided with a copy of the Terms and Conditions at the inception of her contracts with Defendant.

128.    Nevertheless, Defendant has made demand for $12,038.04 in early termination fees based on the automatic renewal provisions of the same Terms and Conditions that Diaz was not initially provided with.

**c)  Alilang LLC**

129.    Plaintiff Alilang LLC ("Alilang") entered into a Customer Service Agreement – Data with WiLine on or about February 4, 2022.  The terms of the Customer Service Agreement – Data were that WiLine would provide Alilang with 200Mbps downstream and 50Mbps upstream of broadband Internet service for the recurring cost of $99.00 per month.  The Service Agreement included a $271.00 adjustment in price that would discontinue after 24 months.  The Customer Service Agreement entered into Alilang is attached as **Exhibit D**.

130.    Despite the limitation of annual price increases in accordance with the CPI, Defendant repeatedly raised its prices more than once annually and not in accordance with the limits imposed by the CPI.  During the two years and four months period between February 15,

2022 through May 31, 2024, Defendant increased Alilang's service charges four (4) times, an average of 1.77 times per year.

131.    The United States Bureau of Labor Statistics reported the annual CPI rates as follows since 2021: 4.7% (ending 2021); 8.0% (ending 2022), and 3.4% (ending 2023).

132.    Defendant increased its service fees to Alilang by the following percentages on the Data Service Agreement since 2022 as follows: 12.0% (from $107.81 to $112.75) on September 1, 2022; 6.40% (from $120.75 to $128.47) on March 1, 2023; and 9.60% (from 503.34 to $551.73) on March 1, 2024.

133.    Defendant increased its service rates by 12.0% in 2022 when the CPI was 4.70% ending in 2021.  Defendant increased its service rates by a combined 13.90% in 2023 when the CPI was 8.0% ending in 2022.  Then, Defendant increased its service rates by 9.60% in 2024 when the CPI was 3.40% ending in 2023.

134.    In addition to the adjustments being made too frequently in violation of the Terms and Conditions' provisions limiting increases to once per annum, the adjustments far exceeded the published annual CPI rates.

135.    Of particular note is the increase that took place on March 1, 2024 was actually an increase of 114.79% to the Local Access Fees.  The access fees were increased from $29.35 to $63.04 per month.

136.    This contravenes the provisions of the Service Agreement Alilang entered into with Defendant.  In a section titled Payment Terms, at ¶3 it states, "WiLine may charge a recurring access fee not to exceed 8.9% of Services charges to recover costs associated with providing WiLine Service to the building."

137.    Starting March 1, 2024, the Local Access Fees totaled $63.04 when the Services charges amounted to $488.69.  That equates to the access fees representing 12.9% of the Services charges, which is more than the 8.9% allowed by the Service Agreements.

138.    The Terms and Conditions at Section 7 also provide, "[p]rices quoted on the Service Agreement may be subject to price adjustments. The Customer will receive at least (30) days prior written notice of any such adjustments."

139.   However, Defendant only provided Alilang with advance written notices of price adjustments prior to the rate increases of September 1, 2022 and March 1, 2023.  Defendant failed to provide any notice whatsoever for the other two increases

140.   Every service rate increase was defective because it either: 1) lacked the requisite 30-day advance notice; 2) was an increase that was within a year of another rate increase; 3) was in excess of the CPI rate; or 4) exceeded the maximum allowable access fee to services charge ratio.

141.   Accordingly, Alilang is owed at least $1,018.47 in restitution for overbilled service fees.

142.   Alilang was not provided with a copy of the Terms and Conditions at the inception of their contracts with Defendant.

143.   Nevertheless, Defendant has made demand for $12,737.79 in early termination fees based on the automatic renewal provisions of the same Terms and Conditions that Alilang was not initially provided with.

144.   Defendant has hired Richard T. Avis, Attorney & Associates, LLC to collect the purported debt.

145.   Richard T. Avis, Attorney & Associates, LLC is not registered with the California Department of Financial Protection and Innovation to collect debts in the State of California.

146.   As a direct result of Defendant's unlawful conduct described above, Plaintiffs suffered economic injury.  Specifically, Defendant's failure to abide by the terms of its Service Agreements caused Plaintiffs financial injury because they were paying more in service charges than they agreed to.

147.   Additionally, Defendant's failure to disclose the Terms and Condition's automatic renewal provisions in a just and reasonable manner harmed Plaintiffs, because Plaintiffs relied solely on the representations of the Service Agreements provided by Defendant.  Defendant's purposeful concealment of the automatic renewal terms had the effect of depriving Plaintiffs of the opportunity to make an informed decision.  Plaintiffs were not given the option to decide

whether or not they wanted to continue with the services provided by Defendant for another term.

148.    The surprise automatic renewal provisions provided Defendant with an unwieldy amount of control over Plaintiffs' broadband and telephony choices, because Defendant would simply threaten Plaintiffs with an exorbitant early termination fee which consisted of an acceleration of payments over a multi-year period.  This figure was often in the tens of thousands of dollars.

149.    Oftentimes, the regular increases in service charges prompted Plaintiffs to attempt to cancel service with Defendant.  Defendant would use the same threat of early termination fees to hold Plaintiffs hostage to its services and unlawful rate increases.

150.    The facts giving rise to Plaintiffs' claims are materially the same as those of the Class they seek to represent.

## CLASS ACTION ALLEGATIONS

151.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23 on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All persons and/or businesses in the State of California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred service rate increases in connection with services provided by Defendant WiLine that were not allowed by the Customer Service Agreements and the Service Agreement Terms and Conditions they entered into with Defendant WiLine;
>
> and
>
> "Termination Fee Subclass"
>
> Any persons and/or businesses that were presented with an early termination fee after they attempted to cancel any service provided by Defendant WiLine after their initial term.

152.    Specifically excluded from the Class are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

153.     Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

154.     **Numerosity:** Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, the Class comprises at least hundreds or possibly thousands of consumers throughout the State of California.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the electronic distribution records of Defendant.

155.     **Commonality and Predominance:** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (1) whether Defendant breached its Service Agreements and Terms and Conditions with Plaintiffs and the Class by increasing service charges without notice, without waiting one year between increases, and failing to limit the increases to the published CPI rate; (2) whether Defendant violated 47 U.S.C. § 201, *et seq*., by imposing charges and engaging in practices, as a common carrier, that are unjust and unreasonable; (3) whether Defendant was unjustly enriched through its overbilling practices of Plaintiffs and the Class; (4) whether Defendant's material breach of its Service Agreements and Terms and Conditions with Plaintiffs and the Class renders all of those contracts null, void, and unenforceable; (5) whether Defendant violated the Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq*., against Plaintiffs and the Class; (6) whether Plaintiffs and the Class are entitled to damages and/or restitution; (7) whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and (8) whether the Plaintiffs and the Class are entitled to attorneys' fees pursuant to Federal Rule of Civil Procedure 23(h); California Code of Civil Procedure § 1021.5; and 47 U.S.C. § 206.

156.     **Typicality:** The claims of Plaintiffs are typical of the claims of the Class in that Plaintiffs and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to comply with the terms of its Service Agreements with Plaintiffs to send requisite notice of service charge increases, to increase rates at a frequency of

1   once per year, and to only raise rates as much as the published CPI rate; and further, Plaintiffs
2   and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based
3   upon Defendant's failure to disclose its automatic renewal conditions to Plaintiffs and the Class
4   in a manner that is just and reasonable.

5        157.    **Adequacy:** Plaintiffs will fairly and adequately protect the Class Members'
6   interests.  Plaintiffs have no interests antagonistic to the Class Members' interests, and Plaintiffs
7   have retained counsel that have considerable experience and success in prosecuting complex
8   class-actions and consumer-protection cases.

9        158.    **Superiority:** A class action lawsuit is superior to the other available methods for
10   the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons:
11   prosecutions of individual actions are economically impractical for members of the Class; the
12   Class is readily definable; prosecution as a class action avoids repetitious litigation and
13   duplicative litigation costs, serves judicial resources and ensures uniformity of decisions; and
14   prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

15        159.    Defendant has acted or failed to act on grounds generally applicable to the entire
16   Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

17        160.    Without a class action lawsuit, Defendant will continue a course of action that
18   will result in further damages to Plaintiffs and members of the Class and Defendant will likely
19   retain the benefits of their wrongdoing.

20        161.    Based on the foregoing allegations, Plaintiffs' claims for relief include those set
21   forth below.

22   

**FIRST COUNT**

**Breach of Written Contracts (Class-wide)**

24        162.    Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1
25   through 161 above.

26        163.    Plaintiffs bring this claim individually and on behalf of the members of the
27   proposed Class against Defendant.

28

164.     As hereinabove alleged, Plaintiffs and Defendant would enter into Service Agreements, sometimes for Data or broadband services, sometimes for Voice-over-Internet-Protocol (VOIP) services, and sometimes for a combination of the two.  These Service Agreements were executed in the State of California.

165.     Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the Service Agreements and the Terms and Conditions of those Service Agreements.

166.     At all times alleged herein, Plaintiffs timely paid more than the fees required under the Service Agreements.

167.     Defendant has breached the written contracts because it had billed and withdrawn from Plaintiffs' bank accounts more fees than were allowed by the Service Agreements and their associated Terms and Conditions.

168.     The Service Agreements and their associated Terms and Conditions specify that Defendant will only "apply an annual price adjustment to the current service fees."  Defendant is in further breach of the written contracts, because it applied multiple price adjustments to the service fees of Plaintiffs within a given year.

169.     Defendant is in further breach of the Service Agreements and their associated Terms and Conditions, because it often failed to provide Plaintiffs with "at least (30) days prior written notice of any such [price] adjustments."  Therefore, the increases that lacked advance notice were improper and void.

170.     As a result of Defendant's breach of the Service Agreements and their associated Terms and Conditions, Plaintiffs and the Class have suffered monetary damages directly resulting from Defendant's over billing practices in an amount to be proved at the time of trial.

**WHEREFORE**, Plaintiffs pray for judgment against Defendant as set forth below.

## SECOND COUNT
### Violation of 47 U.S.C. § 201, et seq. (Class-wide)

171.     Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 170 above.

172.     Defendant is a common carrier as defined under the Communications Act of 1934, as amended by the Telecommunications Act of 1996, and is therefore subject to the regulatory provisions governing telecommunications services, Title 47 of the United States Code, Chapter 5, which regulates Wire or Radio Communication.

173.     As alleged throughout this Complaint, Defendant violated 47 U.S.C. § 201(b) by engaging in practices that resulted in the imposition of unjust and unreasonable charges upon Plaintiffs and the Class, which include raising service rates without providing adequate notice or adhering to the contractual limits. charges, practices, classifications, and regulations for and in connection with such communication service must be "just and reasonable." Any charges, practices, or regulations that are unjust or unreasonable are declared unlawful.

174.     Defendant further violated 47 U.S.C. § 201(b) by imposing automatic renewals without clear and conspicuous terms or securing proper consent.

175.     Plaintiffs and the Class were damaged as a direct and proximate cause of Defendant's violations of 47 U.S.C. § 201, *et seq*.

176.     Pursuant to 47 U.S.C. § 206, Defendant is liable to Plaintiffs and the Class for all damages sustained as a result of its unlawful practices, including the overcharges and automatic renewals in violation of the Service Agreements.

177.     Under 47 U.S.C. § 207, Plaintiffs and the Class have the right to bring this action directly in this Court for recovery of damages, along with reasonable attorneys' fees and costs, as provided for in the statute.

**WHEREFORE**, Plaintiffs pray for judgment against Defendant as set forth below.

## THIRD COUNT
### Unjust Enrichment (Class-wide)

178.     Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 177 above.

179.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

180.    Plaintiffs and the Class conferred benefits on Defendant by agreeing to pay Defendant for broadband Internet and telephony services.

181.    Defendant has been unjustly enriched in retaining the revenues derived from its overbilling of Plaintiffs and the Class.

182.    Retention of these monies under these circumstances is unjust and inequitable, because Defendant billed Plaintiffs and the Class in excess of the limits imposed by the Service Agreements and their associated Terms and Conditions.

183.    Defendant's retention of the non-gratuitous benefits conferred on them through the overbilling of Plaintiffs and the Class is unjust and inequitable.  Accordingly, Defendant must pay restitution to Plaintiffs and the Class for its unjust enrichment, as ordered by the Court.

**WHEREFORE**, Plaintiffs pray for judgment against Defendant as set forth below.

<u>**FOURTH COUNT**</u>
**Violation of the California Unfair Competition Law (Class-wide)**

184.    Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 183 above.

185.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

186.    California Business and Professions Code § 17200, *et seq*., defines unfair competition to include any "unfair," "unlawful," or "deceptive" business practice; and provides for injunctive relief and restitution for violations.

187.    The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practices or acts.

188.    Plaintiffs are informed and believe, and thereupon allege, that Defendant has committed numerous unfair, unlawful, or deceptive business practices including: (1) billing in excess of the agreed upon Service Agreements; (2) applying increases to service charges more frequently than agreed upon in the Service Agreements; (3) failing to provide advance written

notices of service charge increases as required and agreed upon in the Service Agreements; (4) inducing Plaintiff into adhesion contracts, whose terms are procedurally and substantively unconscionable; and (5) failing to provide contract terms that are just and reasonable.

189.    Plaintiffs allege the billing and automatic renewal practices employed by Defendant are not just and reasonable and are therefore declared to be unlawful in accordance with the Communications Act of 1934, as amended by the Telecommunications Act of 1996. 47 U.S.C. § 201(b).

190.    Plaintiffs are informed and believe that Defendant continues to engage in the practices described herein and is continuing and will continue to benefit financially from these unfair and illegal practices unless enjoined by this Court from doing so.

191.    As alleged herein, Defendant's practices are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers; furthermore, the Defendant's practices cannot be justified as they serve only to unjustly enrich the Defendant at the expense of Plaintiffs and the Class.

192.    As a proximate result of Defendant's actions, Plaintiffs and the Class have suffered injury in fact and lost money or property as hereinabove alleged.

193.    The actions of Defendant detailed herein constitute unfair, unlawful and deceptive business practices, and further, constitute actions for which injunctive relief and restitution are available.

194.    Under California Business and Professions Code § 17200, et seq., Plaintiffs and the Class are entitled to restitution of all funds and losses caused by Defendant's deceptive practices.

195.    Under California Business and Professions Code § 17200, *et seq*., Defendant should be enjoined from any and all unfair, unlawful, and deceptive business practices now and in the future.

**WHEREFORE**, Plaintiffs pray for judgment against Defendant as set forth below.

## FIFTH COUNT

### Concealment (Named Plaintiffs Only)

196.    Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 195 above.

197.    Named Plaintiffs W.A. Call, Diaz, and Alilang individually bring this claim for concealment against Defendant.

198.    Defendant offered broadband Internet services and telephony services as a service provider to Plaintiffs W.A. Call, Diaz, and Alilang as its customers.  Plaintiffs W.A. Call; Diaz; and Alilang, respectively, and Defendant were in contractual business relationships, where Defendant agreed to deliver certain services in exchange for payment from these Plaintiffs.

199.    Defendant had exclusive knowledge of the Terms and Conditions, which Defendant intentionally failed to disclose to Plaintiffs W.A. Call, Diaz, and Alilang.  Defendant could have easily provided a copy of the separate Terms and Conditions as an additional attachment along with the Service Agreements.  Instead, Defendant deliberately elected not to.

200.    Moreover, Defendant used dubiously ambiguous language in its Service Agreements, which could be read to mean a copy of the same terms and conditions of the Service Agreement could be found at www.wiline.com.  The Service Agreements contain small 8-point text that reads, "[t]he signatory below hereby represents and warrants to WiLine that (s)he has the authority and power to sign on behalf of the Customer and bind Customer to this Order and Service Agreement Terms and Conditions as posted on www.wiline.com."

201.    Defendant prevented Plaintiffs W.A. Call, Diaz, and Alilang from finding the Terms and Conditions on its website, because they cannot be found at www.wiline.com.  Instead, Defendant hides the Terms and Conditions under multiple layers of its website, as hereinabove alleged.

202.    Plaintiffs W.A. Call, Diaz, and Alilang did not know of the concealed Terms and Conditions, and Plaintiffs W.A. Call, Diaz, and Alilang did not know about the automatic renewal language contained in the Terms and Conditions, because Defendant did not disclose these facts to Plaintiffs W.A. Call, Diaz, and Alilang.

203.    Had the Terms and Conditions been presented to Plaintiffs W.A. Call, Diaz, and Alilang or had the automatic renewal terms been disclosed, Plaintiffs W.A. Call, Diaz, and Alilang would have behaved differently or made alternative choices.

204.    As a proximate result of the fraudulent misconduct of Defendant as herein alleged, Plaintiffs W.A. Call, Diaz, and Alilang were harmed.  Plaintiffs W.A. Call, Diaz, and Alilang entered into Service Agreements with Defendant and could not terminate those Service Agreements without incurring significant early termination fees.  The early termination fees were based on an automatic renewal of these Plaintiffs' initial term, which they were never made aware would occur.

205.    Defendant's concealment of the Terms and Conditions and the automatic renewal clause was a substantial factor in causing Plaintiffs W.A. Call, Diaz, and Alilang harm.

206.    Defendant's concealment of the Terms and Conditions and the automatic renewal clause contained therein resulted in Plaintiffs W.A. Call, Diaz, and Alilang being held hostage into Service Agreements in which they were being overbilled and could not terminate for fear of incurring hefty early termination fees.

207.    The aforementioned conduct of the Defendant was an intentional misrepresentation, deceit, or concealment of material facts known to Defendant with the intention on the part of Defendant to thereby deprive Plaintiffs W.A. Call, Diaz, and Alilang of property or legal rights or otherwise cause injury, and was despicable conduct that subjected Plaintiffs W.A. Call, Diaz, and Alilang to a cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

**WHEREFORE**, named Plaintiffs W.A. Call, Diaz, and Alilang pray for judgment against Defendant as set forth below.

## <u>SIXTH COUNT</u>
### False Promise (Named Plaintiffs Only)

208.    Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 207 above.

209.     Named Plaintiffs W.A. Call, Diaz, and Alilang individually bring this claim for false promise against Defendant.

210.     As hereinabove alleged, Defendant made various promises to Plaintiffs W.A. Call, Diaz, and Alilang to bill a certain amount for services rendered with very specific conditions needing to be met before Defendant would apply price adjustments to its service charges.  Defendant promised to only increase service charges once per year, limited to the published CPI rate, and only with 30 days advance notice.

211.     At the time Defendant made these promises to the Plaintiffs W.A. Call, Diaz, and Alilang, it did not intend to perform these promises.  Defendant knew these promises to be false because it had failed to live up to these same promises with existing customers at the same time it was inducing Plaintiffs W.A. Call, Diaz, and Alilang to enter into Service Agreements with it.

212.     When Defendant made these promises, it knew them to be false and made them with the intent to deceive and defraud Plaintiffs W.A. Call, Diaz, and Alilang and to induce them to act in reliance on these promises in the manner hereafter alleged, or with the expectation that these Plaintiffs would act.

213.     Defendant intended for Plaintiffs W.A. Call, Diaz, and Alilang to rely on these promises, so that these Plaintiffs would abandon their existing broadband providers and/or port their telephone numbers to WiLine.

214.     Plaintiffs W.A. Call, Diaz, and Alilang reasonably relied on Defendant's promises to bill the amounts specified in the Service Agreements and only increase the service charges if all of the agreed upon conditions were met, as was promised by Defendant.

215.     Defendant did not perform the promised acts.  Instead, it increased rates without notifying Plaintiffs W.A. Call, Diaz, and Alilang, in amounts higher than the published CPI rate, and more often than once per year.

216.     Plaintiffs W.A. Call, Diaz, and Alilang suffered economic harm as a result of Defendant's false promises.  Beyond the over paying of service fees, Plaintiffs W.A. Call, Diaz, and Alilang were deprived of the choice of alternative broadband and telephony providers, which could have provided comparable services for less.

217.     Further, Plaintiffs W.A. Call and Diaz suffered harm because they relinquished control of their phone numbers to Defendant, which further entrenched Plaintiffs W.A. Call and Diaz in an oppressive relationship with Defendant.

218.     As a proximate result of the fraudulent conduct of Defendant as herein alleged, Plaintiffs W.A. Call, Diaz, and Alilang were induced to and did rely on Defendant's promises, which were a substantial factor in causing Plaintiffs W.A. Call, Diaz, and Alilang harm.

219.     The aforementioned conduct of the Defendant was an intentional misrepresentation, deceit, or concealment of material facts known to Defendant with the intention on the part of Defendant to thereby deprive Plaintiffs W.A. Call, Diaz, and Alilang of property or legal rights or otherwise cause injury, and was despicable conduct that subjected Plaintiffs W.A. Call, Diaz, and Alilang to a cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

**WHEREFORE**, named Plaintiffs W.A. Call, Diaz, and Alilang pray for judgment against Defendant as set forth below.

## SEVENTH COUNT
### Conversion (Named Plaintiffs Only)

220.     Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 219 above.

221.     Named Plaintiffs W.A. Call, Diaz, and Alilang individually bring this claim for conversion against Defendant.

222.     Plaintiffs W.A. Call, Diaz, and Alilang had a right to possess the monies in their bank accounts, debit card accounts, and credit card accounts.

223.     As a result of the charges made by Defendant to Plaintiffs W.A. Call, Diaz, and Alilang's payment methods, which include, but are not limited to, bank accounts, debit cards, and credit cards without authorization to take those amounts in excess of the agreed upon service charges and in violation of California law, Defendant has substantially interfered with Plaintiffs W.A. Call, Diaz, and Alilang's property by taking money that belongs to these Plaintiffs.

224.     The amount of money wrongfully taken by Defendant is capable of identification.

225.     As a result of Defendant's actions, Plaintiffs W.A. Call, Diaz, and Alilang have suffered economic damages with more money being taken from their bank accounts than what was allowed by the agreements between Plaintiffs W.A. Call, Diaz, and Alilang and with the Defendant.

226.     The aforementioned conduct of the Defendant was an intentional misrepresentation, deceit, or concealment of material facts known to Defendant with the intention on the part of Defendant to thereby deprive Plaintiffs W.A. Call, Diaz, and Alilang of property or legal rights or otherwise cause injury, and was despicable conduct that subjected Plaintiffs W.A. Call, Diaz, and Alilang to a cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

**WHEREFORE**, named Plaintiffs W.A. Call, Diaz, and Alilang pray for judgment against Defendant as set forth below.

## EIGHTH COUNT
### Negligence (Named Plaintiffs Only)

227.     Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 226 above.

228.     Named Plaintiffs W.A. Call, Diaz, and Alilang bring this claim for negligence against Defendant.

229.     At all times herein, Defendant acted negligently in its contract negotiations, contract execution, and billing practices so as to cause Plaintiffs W.A. Call, Diaz, and Alilang harm.

230.     Plaintiffs W.A. Call, Diaz, and Alilang were harmed by Defendant's actions or inaction, as alleged herein.

231.     Defendant's negligence was a substantial factor in causing harm to Plaintiffs W.A. Call, Diaz, and Alilang.

232.     Defendant violated the Communications Act of 1934, as amended by the Telecommunications Act of 1996, and those violations were a substantial factor in bringing about harm to Plaintiffs W.A. Call, Diaz, and Alilang.

233. Additionally, Defendant violated California Financial Code § 100000, *et seq.*, by hiring a debt collection agency it knew, or should have known, was not registered to collect debts in the State of California. These violations were a substantial factor in bringing about harm to Plaintiffs W.A. Call and Alilang.

234. Defendant did not act with reasonable care in its business relationship with Plaintiffs W.A. Call, Diaz, and Alilang. Indeed, its violation of the above referenced statutes which were designed to protect the Plaintiffs, constitutes negligence *per se*. Defendant's lack of reasonable care was the proximate cause of harm to Plaintiffs W.A. Call, Diaz, and Alilang.

**WHEREFORE**, named Plaintiffs W.A. Call, Diaz, and Alilang pray for judgment against Defendant as set forth below.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other similarly situated Class members, seek judgment against Defendant, as follows:

A. For an order certifying the Class, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

B. For an order declaring that Defendant's conduct violates the statutes and common laws referenced herein;

C. For an order finding in favor of Plaintiffs and the Class on counts one through four asserted herein;

D. For actual, compensatory, and statutory damages in amounts to be determined by the Court and/or jury;

E. For prejudgment interest on all amounts awarded;

F. For an order of restitution and all other forms of equitable monetary relief;

G. For declaratory and injunctive relief as pleaded or as the Court may deem proper; and

H. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees pursuant to statute and costs of suit.

Named Plaintiffs W.A. Call, Diaz, and Alilang individually seek judgment against Defendant, as follows:

I.    For an order declaring that Defendant's conduct violates the common laws referenced herein;

J.    For an order finding in favor of Plaintiffs W.A. Call, Diaz, and Alilang on counts five through eight asserted herein;

K.    For actual, compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

L.    For prejudgment interest on all amounts awarded;

M.    For an order of restitution and all other forms of equitable monetary relief;

N.    For declaratory and injunctive relief as the Court may deem proper; and

O.    For an order awarding named Plaintiffs W.A. Call, Diaz, and Alilang their reasonable attorneys' fees, expenses, and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

DATED: October 11, 2024          **MICHAEL A. MAZZOCONE, ATTORNEY AT LAW**

By:    /s/ Michael A. Mazzocone
       Michael A. Mazzocone, Esq.

**HENNIG KRAMER LLP**

By:    /s/ Rob Hennig
       Rob Hennig, Esq.

By:    /s/ Sam Brown
       Sam Brown, Esq.

*Attorneys for Plaintiffs and the Putative Class*